THE WISCONSIN ENGINE COMPANY, *Appellant,* V. THE
ALTOONA PORTLAND CEMENT COMPANY, *Appellee.*

No. 17,681.

SYLLABUS BY THE COURT.

1. SPECIAL FINDINGS—*Verdict—Judgment.* Special findings do
not form the basis for a judgment unless inconsistent with
the general verdict and consistent with one another.

2. INSTRUCTIONS—*Reading Contract to Jury.* Instructions
which fairly recite the claims and contentions of the parties
are not rendered erroneous by reading to the jury the con-
tracts involved in the action.

3. SPECIAL QUESTIONS UNANSWERED—*Not Prejudicial.* A re-
fusal to require the jury to answer a certain question more
specifically is not materially prejudicial when such question
has already been given a fairly correct answer and when the
matter covered by such question has by the parties been
eliminated from the controversy.

4. JURY—*Triers of Facts.* The jury are the triers of facts, and
their verdict reached after considering an abundance of con-
flicting evidence, and approved by the trial court, must stand.

Appeal form Wilson district court. Opinion filed
October 12, 1912. Affirmed.

*Henry Schoelkopf,* of Milwaukee, Wis., *F. F. Roz-
zelle,* of Kansas City, Mo., *John J. Jones,* of Chanute,
and *E. D. Mikesell,* of Fredonia, for the appellant;
*Rozzelle, Vineyard & Thacher,* of Kansas City, Mo., and
*Jones, Reid & Allen,* of Chanute, of counsel.

*C. W. Shinn,* of Neodesha, *W. S. Willett,* of Altoona,
and *H. M. Beardsley,* of Kansas City, Mo., for the ap-
pellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff sued to recover an alleged
balance of $66,000 of the purchase price for three gas
engines built for the defendant. In December, 1907,
it contracted to build and furnish three engines of a
specified kind in strict accordance with the specifica-

tions attached to and made part of the contract subject to such changes as were authorized therein. The contractor was to submit detailed drawings of any part of the engine to the defendant's engineer, Victor Beutner, for criticism and approval, and it was agreed that during the progress of the work the quality, design, material and character of the workmanship should be subject to Beutner's inspection and approval. The defendant was to furnish the foundations to suit the contractor's requirement, and all common labor, help and material necessary to the proper erection of the machinery, assuming all responsibility as to the proper depth and size of the foundations. The contractor was to furnish skilled help necessary to supervise the erection and assembling of the engines and the pipe work and to operate the installation "until its success is clearly demonstrated and until the engines are accepted and final payment for the same is approved by the owner's engineer."

Each engine was to develop 550 brake horsepower and to operate alternating generators in parallel with each other, the title and right of possession to remain in the plaintiff until final payment should be made. In November, 1909, a supplementary agreement was entered into reciting that "the three engines furnished under the original contract are not performing in a manner as to fulfill the guarantee set forth in the original contract," and providing that the engine company should, with all possible speed, replace all defective parts and proceed with the work in such manner that the first engine should be in perfect condition according to contract not later than January 15, 1910, the second and third not later than March 15, 1910; to maintain until the completion of all permanent changes a sufficient force of mechanics to make any changes, alterations, and repairs without additional cost to the

cement company. This supplemental contract contained the following provisions:

"It is further agreed that after all permanent changes in the design and construction have been made upon the first engine the party of the second part shall have the privilege of operating said engine for a term of 45 days, and to notify the party of the first part at any time during these 45 days to run a 72 hour test to ascertain if said engine in its redesigned and reconstructed condition will meet all the stipulations and guarantees of the original contract.

"It is further agreed that if by the result of this test or by the failure of the party of the second part to have the first engine ready for such test within the stipulated time, or by the ordinary operating conditions, it should be demonstrated that the terms of the original contract have not been fulfilled, the party of the first part shall have the right at his own option to notify the party of the second part to remove each or any of the three units and if the party of the second part fails to comply at once with such notification then the party of the first part shall have the right to remove any or all engines with its own help at the expense of the party of the second part, and the party of the second part agrees to remit and refund upon removal of each engine from the foundation of the party of the first part one-third ($\frac{1}{3}$) of the sums paid to this date in stock, cash and note, provided however that the party of the first part shall not use the first engine more than two (2) months, the second engine more than four (4) months, and the third engine more than six (6) months, after the test has been demonstrated that the guarantee of the original contract has not been fulfilled."

The petition alleged that the engines had been furnished in accordance with the contract, that after each and all of them were completed and in place and in operation they were operated for a period of more than forty-five days, and that during such period (namely, on or about the twentieth day of May, 1910) the plaintiff notified the defendant to run a seventy-two-hour test to ascertain if the engines would meet all stipulations and guarantees in the contract, that the defend-

ant declined, refused and neglected to make such tests,
and that ever since had been using and was still using
the engines for the purpose of operating the plant, the
petition being filed June 10, 1910.   The second cause
of action alleged that the foundations provided for by
the defendant were insufficient in that they were not
deep enough or large enough to properly hold and sup-
port the engines or any of them, whereby the plaintiff
was compelled to remove the greater portion of each of
the engines from the foundations in order to permit
the defendant to make them larger, to plaintiff's dam-
age of $5000.   The answer denied this latter allega-
tion, and by way of cross-petition alleged that the first
contract obligated plaintiff to have its engines com-
pleted prior to the first day of March, 1909, at which
time the defendant was otherwise ready to produce not
less than 1000 barrels of cement a day; that the plain-
tiff assured the defendant from time to time prior to
November 11, 1909, that the engines would very soon
be completed and in condition to operate in accordance
with the contract; that on November 11, 1909, a sup-
plemental contract was entered into but that the plain-
tiff did not have the first engine in perfect condition
by January 15, 1910, nor either of the others by March
15, 1910; that it refused to operate such engine or
either of them while a seventy-two-hour test was being
made; that the engines failed to comply with the terms
of the contract in that each failed to develop 550 brake
horsepower, and that the three would not operate
alternating-current generators as contracted for; that
they would not operate continuously or successfully
but were constantly breaking down or giving way in
some of their parts, requiring overhauling or repair-
ing and the stopping of the operation of the plant, and
that it had been demonstrated by the ordinary operat-
ing conditions that the terms of the contract of De-
cember 21, 1907, had not been fulfilled; that the engines
were unfit for the work desired.   After setting out

various specifications of defective mechanism and operation it was alleged that the defendant, on the 22d day of July, 1910, notified the plaintiff to remove each and all of the engines and that it refused to accept them. There was a claim for damages but this went out of the case and need not be considered. The reply alleged that the failure to have the first engine in perfect condition by January 15, 1910, was waived by the defendant in that it was orally agreed that in consideration of changing the water connections on the engines their erection and completion within the time specified were to be delayed until such water connections were changed and completed, and that the engines were completed and in working condition in accordance with the contract and such oral agreement. After a protracted trial the jury returned a verdict in favor of the defendant for $43,556.46.

Special findings were returned to the effect that the plaintiff first offered the defendant the seventy-two-hour test provided for in the contract about May 21, 1910, and the last test about June 22, 1910, at Kansas City, Mo. That the first test was not refused "except under the supervision of Victor Beutner"; that the second test was refused "in a measure"; that the defendant started using engine No. 3 about July 1, 1910, after this suit was begun, engine No. 2 about July 1, and engine No. 1 about July 1, 1910, and quit using engine No. 3 about December 20, 1910, No. 2 about November 15, 1910, and No. 1 about January 10, 1911. That the defendant notified the plaintiff on July 22, 1910, that all three of the engines failed to comply with the contract and ordered them removed; that it used the engines more or less to operate its plant from July 1, 1910, to January 1, 1911.

The plaintiff appeals and complains of the rejection and admission of certain testimony, of giving and refusing certain instructions, refusing to require a more direct answer to question number four, overruling the

plaintiff's motion for judgment upon the special findings and overruling a motion for a new trial.

The plaintiff contends that it was entitled to judgment on the special findings. It is argued that acceptance could be brought about either by a seventy-two-hour test or by trial under ordinary operating conditions; that if the plaintiff demanded the seventy-two-hour test that was the only means of demonstration open to the parties; if the plaintiff failed to offer the engines for test within the stipulated period the trial under ordinary conditions would necessarily follow as a means of determining the quality of the engines, and that a failure to make the test or permit it to be made operated as an acceptance; that the findings of the jury concerning the time to which the engines were used showed acceptance by the defendant; that the defendant ran its plant with the engine to within six days of the six months period after offer of test by the plaintiff, thus showing a fixed design to get the maximum use out of the engines and still avoid an acceptance.

It must be borne in mind, however, that the general verdict was in favor of the defendant, and unless the special findings are consistent with one another and contrary to the verdict they can not form the basis for a judgment. These findings do not show that the defendant refused the first offered test except under the supervision of Beutner, who was not then with the company, while they show that the second was refused only in a measure. The findings as to the time the engines were used by the defendant were simply to the effect that they were used "more or less to operate its plant" which is too indefinite to overturn the general verdict.

Complaint is made that the court read the contracts to the jury and attempted to give the substance of the pleadings without plainly advising what the issues were. An examination of the instructions, however, shows that in numbers four to seven, inclusive, the

court gave a painstaking and thorough recital of the claims made by both parties, and the fact that in connection with the eighth instruction he read the contracts themselves does not justify the criticism made.

It is complained that in the eleventh and twelfth instructions the jury were told that they must determine whether or not the engines conformed to the terms and specifications of the contracts "without telling the jury, either at that time, or before or afterwards, what the terms and specifications of the contracts were." But, as already suggested, not only were the claims arising out of the contracts made plain but the contracts were read to the jury.

Instruction No. 13 was to the effect that if on or about June 22, 1910, the plaintiff was and had been operating the engines through its engineer Ostedt, they not having been accepted, and such engines, or either of them, were at that time broken or of poor workmanship or were not in their operations fulfilling the requirements of the contract, then the plaintiff could not at that time tender and require defendant to accept them. It is asserted that this instruction confused tender for acceptance with tender for test, but certainly the plantiff was not harmed by advising the jury that the defendant could not be made to accept engines which were not of the kind contracted for.

In No. 15 the jury were told that the plaintiff requested the test but the defendant refused to make it under the supervision of Beutner and the plaintiff refused to accept some one else, but that the parties themselves construed this as applied to all engines, for, just a day or two prior to the bringing of the action, the plaintiff requested that a test run be made for seventy-two hours and was told that the defendant desired a thirty- or sixty-day test.

"The question then arises, was defendant bound to make a 72-hour test under the supervision of Victor Beutner, or was there any warrant or right on the part of the defendant to demand a 30- or 60-day test run?"

This is said to be erroneous because it assumes that the plaintiff refused to make a seventy-two-hour test under anyone but Beutner, and that the defendant refused a seventy-two-hour test of any kind. The findings do not support this contention.

In the 16th instruction the jury were advised that the parties themselves had eliminated the question of a seventy-two-hour test, and as there was no warrant for the defendant to demand a thirty- or sixty-day test run, the remaining question was as to the test of the engines as appearing from ordinary operating conditions in connection with the plant. This is said to have brought a new issue into the case which could not have arisen if the seventy-two-hour test was not necessary. Referring to the contract, it will appear that under the one first made the quality of the design and material and the character of the workmanship were to be subject to the inspection and approval of Beutner, and the contractor was to furnish such skilled help as necessary to supervise the erection and assembling of the engines and the pipe work and to operate the installation "until its success is clearly demonstrated and until the engines are accepted and final payment for the same is approved by the owner's engineer." Under this contract whoever might be the engineer at the time was manifestly the one to determine as to acceptance and approval. Under the supplemental contract it was agreed that the plaintiff was to maintain a sufficient force to make any changes, alterations and repairs, etc., "and party of the second part agrees to be guided in this respect both as to the number of mechanics required and to the repair and spare parts necessary to fulfill this agreement by the judgment of Victor Beutner, the engineer under whose supervision the original contract is to be carried out." Then follow the provisions as to a seventy-two-hour

test of the first engine during the forty-five-day period, which is itself followed by this express provision:

"It is further agreed that if, by the result of this test, or by the failure of the party of the second part to have the first engine ready for such test within the stipulated time, or by the ordinary operating conditions, it should be demonstrated that the terms of the original contract have not been fulfilled, the party of the first part shall have the right at his own option to notify the party of the second part to remove each or any of the three units," etc.

This is coupled with the proviso that the defendant should not use the first engine more than two, the second more than four or the third more than six months "after the test has been demonstrated that the guarantee of the original contract has not been fulfilled."

We think the only result of these various provisions is that the plaintiff contracted to furnish engines which would do the work specified; that whenever it was demonstrated that they would thus perform it was the duty of the defendant to accept and pay for them; but that after it had been demonstrated that they would not so perform then the defendant could not use the engines more than the lengths of times specified. Not only do the findings fail to show that the use of the engines exceeded the length of time referred to, but there was testimony to show that the engines at no time did the work prescribed without frequent breaks and stoppages causing loss, delay and damage to the operation of the plant. It appears that Beutner left the employ of the defendant and ceased to be its engineer, and we find nothing in the contracts which required either party to rely exclusively upon his judgment as to whether the engines fulfilled the requirements of the supplemental contract.

The jury found that the defendant began using two of the engines about July 1 and the other about the middle of July, 1910; and began repairing the latter

about July 1 and quit using it about January 10, 1911, and quit using the others about September 20 and November 15 respectively. In instruction No. 19 the jury were told that the contract did not mean continuous operation, but if any engine was operated more than two months, or any other more than four months, or any other more than six months after an ordinary operating test demonstrating that such engine did not comply with the terms of the original contract, that fact would amount to an election and entitle the plaintiff to a verdict; that the contract did not mean that the time should begin to run from the day that the defendant notified the plaintiff that it would not accept the engines but from the day that the evidence showed that the engines had demonstrated by the ordinary operating test that they did not conform to the contract. The jury found that on July 22, 1910, the defendant notified the plaintiff that all three of the engines failed to comply with the contract and ordered them removed. It necessarily devolved upon the plaintiff to show either that they had at that time been demonstrated to comply with the requirements or else that after that time the defendant so used them in the operation of its plant as to amount to an acceptance. We do not discover that the testimony shows either and the jury did not find that it did. The plaintiff, under the contract, retained title to the engines until final payment, and it appears that on the 22d of June, 1910, its representative attended a directors' meeting of the defendant at Kansas City and there stated that the engines were all in good condition and should be accepted. It was stated in reply that nothing would be done until a test had been made, that a seventy-two-hour test meant nothing to the defendant, and at least thirty days and perhaps sixty days would be necessary. Two days afterwards the plaintiff sued the defendant, so that the use made by the defendant of the engines was all subsequent to the beginning of the action.

Complaint is made that the court did not advise what was meant by ordinary operating conditions, but we think the testimony was sufficient to enable the jury to understand the meaning of these words without specific definition.

Complaints are made touching certain rulings as to the admission of evidence, but we find no material error therein.

The refusal to require the jury to answer question No. 4 directly and specifically was not materially prejudicial for the reason that the answer given was fairly correct, and for the further reason that the seventy-two-hour test referred to in the question had been, as the trial court instructed, practically eliminated by the parties.

The plaintiff insists that the verdict and judgment are contrary to the evidence and contrary to law; that the conditions were that the engines be completed by the various times agreed upon, that the plaintiff was to be guided with respect to changes and repairs by the judgment of Beutner, that the fulfillment of the contract was to be determined either by a seventy-two-hour test or by trial under ordinary operating conditions, and that all of these prerequisites were complied with by the plaintiff. It is contended that the delay in the completion was caused by the changes suggested by the defendant's engineer, and that the defendant by its conduct waived completion at the time fixed by the written contracts, and in this counsel are correct. It is submitted, with a claim of support by numerous quotations from the evidence, that the uncontradicted testimony shows that the engines conformed to the specifications, and it is but fair to say that the testimony of Beutner and other witnesses goes far to support this contention. However, the story of the way in which the engine operated, as detailed by numerous other witnesses who were at the plant and saw the frequent trouble, delay, stoppage and demoralization of

The State, *ex rel.,* v. Martin.

the work, puts the case into that great class of cases wherein there is a decided conflict of evidence which must be settled by the verdict of a jury.   While the plaintiff's testimony taken by itself tends strongly to support the theory that the engines fulfilled the requirement and that their nonacceptance was willful and without excuse on the part of the defendant, still about two years had elapsed from the making of the first contract when the second stipulation recited that up to that time the engines had not performed their mission.   After entering upon the work under the supplemental contract the plaintiff had charge and control of the engines, retaining title thereto until two days before it brought suit to recover the purchase price; but after the defendant took charge, as well as before, the testimony as to the sufficiency of the engines is so conflicting and the opposing contentions of the parties are so far supported thereby that the jury were justified in deciding as they did, and the verdict having been approved by the trial court must stand.

The judgment is affirmed.